UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* CLAUDIA MARLAR; and CLAUDIA MARLAR, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.: 3:04-CV-415 (VARLAN/SHIRLEY) |
| BWXT Y-12, L.L.C., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Realtor Claudia Marlar brought this *qui tam* action against defendant BWXT Y-12, L.L.C. ("BWXT") claiming that BWXT violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and wrongfully terminated her in retaliation for her allegations of wrong-doing. After the United States declined to intervene, BWXT moved to dismiss the case pursuant to Rules 9(b) and 12(b)(6), Federal Rules of Civil Procedure [Doc. 27]. For the reasons that follow, the motion will be GRANTED and this action DISMISSED.

I.   Factual Background

The following factual background is taken from the plaintiffs' complaint and considered in the light most favorable to her.

BWXT's sole business is to manage and operate the plant known as Y-12 located in Oak Ridge, Tennessee, pursuant to a contract with DOE entered into on August 31, 2000.

The contract sets forth the estimated cost for each of the fiscal years 2001-2003. These costs include performance-based incentives for each fiscal year for various categories of performance, including Environment, Safety and Health. [Doc. 1, Complaint at ¶ 11].

The maximum available fees for the first three years of the contract were $22,000,000, $22,000,000, and $22,940,552. The actual available and earned fee for each year was based on objective and subjective criteria established in a Performance Evaluation Plan set out in the contract, as was the criteria for its measurement. The total fee available for the first fiscal year was $20,166,666. The Fee was $16,135,672, of which 7,530,985 was based on subjective evaluation and $8,604,587 was based on performance-based criteria. The available fee for the second fiscal year was $22,000,000. The Fee was $19,312,689 of which $5,554,568 was based on subjective evaluation and $13,758,121 was based on performance-based objective criteria. The available fee for the third fiscal year was $22,940,552. The Fee was $21,188,511. Commencing in fiscal 2003, the subjective fee was replaced by a new concept, the "comprehensive incentive fee." This fee was based on performance objectives which had both quantitative and qualitative elements. For satisfactory performance, as determined by DOE, of all performance objectives BWXT was entitled to receive as its Fee the entire available fee. If one or more objectives were not met, the fee was adjusted downward. [*Id.* at ¶ 12-14.]

During each fiscal year representatives of DOE and BWXT met on a monthly basis to review BWXT's performance. In connection with that meeting BWXT provided DOE with oral and/or written statements as to its performance under the various categories. At the

end of the fiscal year BWXT provided DOE with a certified Completion Form for each category detailing its performance. It also provided DOE with a self-evaluation which included all Completion Forms and a general evaluation for its entire performance for the year. Based on these statements, BWXT was partially paid the available fee on a quarterly basis. The final Fee was paid after reconciliation with partial payments made to BWXT after the Completion Forms and the BWXT self-evaluation were submitted. [*Id.* at ¶ 15-16.]

Under the contract BWXT was reimbursed for allowable costs incurred in performing its obligations including personnel costs, such as salaries, wages and incentive compensation (bonuses) and associated overhead costs. These costs were paid monthly on invoices submitted by BWXT. BWXT also submitted an annual certification that all costs claimed were properly incurred under the contract. [*Id.* at ¶ 17-18.]

Plaintiff Claudia Mahlar is a certified nurse practitioner who worked in the Occupational Health Services Division ("OHS") during her tenure at BWXT. The complaint does not identify when she began working at that position. She reported to OHS Assistant Medical Director who reported to the OHS Medical Director. He, in turn, reported to the Division Manager of the Environmental Safety and Health ("ES&H") Division. The manager of Industrial Safety also reported to the ES&H Division Manager. Non-medical Industrial Safety personnel were in charge of reporting accidents and injuries to the Safety Manager. Two Safety Managers were assigned to work in the OHS Division. The complaint does not provide the names of any of these employees. [*Id.* at ¶ 19-21.]

3

The Performance Evaluation Plan set forth several elements upon which the Fee was based including Environment, Safety and Health. Plaintiff contends that "on information and belief" the Environment, Safety and Health element, related elements and the management thereof constituted a significant portion of the available fee. The measurements of performance for Safety and Health components were based in large part on the records and reports of occupational injuries and illnesses required to be made by BWXT by various contractual and regulatory requirements. [*Id.* at ¶ 22-23.]

Under the Plan, BWXT is required to keep a record of and report all occupational injuries and illnesses. It was required to record and report all new work-related injuries and illnesses that result in (1) death; (2) days away from work; (3) restrictions on work; (4) transfer to another job; (5) medical treatment beyond first aid; or (6) loss of consciousness. Any significant injury or illness diagnosed by a licensed health care professional had to be recorded and reported irrespective of whether it falls within any of the above. [*Id.* at ¶ 24.]

Medical treatment beyond first aid included the administration of any prescription drug (except those used for diagnostic purposes) or of non-prescription drugs at above normal dosages or strength. If a licensed health care professional recommended medical treatment, that had to be recorded and reported even if the employee did not follow the recommendation. BWXT was required to use standard OSHA Forms or the equivalent to record all injuries and illnesses within seven days of receiving the information. At the end of each calendar year, BWXT was required to create an annual summary of the injuries and illnesses recorded, certify the summary and post it in a conspicuous place. [*Id.* at ¶ 27-30.]

The complaint alleges that "on information and belief" the certifications made by BWXT in connection with its monthly reports, its annual Completions Forms and its annual self-assessment were based on the systematic and significant underreporting of work-related injuries and illnesses and time missed from work. [*Id.* at ¶ 31.] The complaint then describes several examples of this underreporting as follows:

> 1. Marlar treated employees who stated that they had been given prescription drugs as a result of work-related injuries or illnesses when there was no record of such prescriptions in their medical records;
>
> 2. A licensed medical provider routinely prescribed drugs that would not require a prescription at over-the-counter strength at strength levels that would require a prescription and the records inaccurately reflected that the drug had been provided at non-prescription strength;
>
> 3. In May 2003 an employee suffered a head injury and was treated with a prescription drug injection. Marlar later discovered that the medical record did not include a notation of the injection;
>
> 4. In 2002, two employees suffered cervical strains while working and received a prescription drug but no notation of the prescription drug was entered in their medical records;
>
> 5. In 2002, an employee received a prescription-drug injection but there was no notation of the prescription-drug injection;
>
> 6. On or about January 1, 2003, an employee came to OHS with carpel tunnel syndrome whereupon a wrist sprint was prescribed but not noted in his medical record;
>
> 7. In 2002, Marlar treated an employee with a prescription drug for a bee sting because he had a history of anaphylactic reaction to bee stings but the patient's treatment with the prescription drug was not reported.

5

8. In 2003, Marlar learned from another nurse that she had treated another employee on blood thinner who had suffered a skin tear with a pressure dressing but the patient's treatment with the pressure dressing was not reported;

9. On October 7, 2002, the Safety Division asked Marlar if an employee who had been at home as a result of a work-related injury could have worked with restrictions. Marlar stated she was in no position to make that determination so the non-medical Safety Manager made the determination that the employee could have worked on a restricted basis;

10. In 2003, an employee developed respiratory problems as a result of being exposed to glue fumes at work. The non-medical Safety Employees, together with a physician's assistant, determined that the incident was a recurrence of asthma and was therefore not reportable;

11. The non-medical Safety Employees constantly urged Marlar and other members of the Medical Division to bypass standard medical protocol so as to avoid having to report injuries, illnesses or other medical treatment and some did so;

12. The non-medical Safety Employees routinely interviewed employee patients prior to a diagnosis being made and urged the OHS personnel to make a diagnosis that did not require reporting and some did so;

13. The non-medical Safety Employees, without notifying any health care provider, would interview employees who came to OHS in order to influence the way the employee presented his reason for coming to OHS so that the incident would be nonreportable;

14. The non-medical Safety Employees routinely required injured or ill employees to go to OHS and to report back to OHS on the following day rather than be sent home or to an outside healthcare provider. Plaintiff alleges that "on information and belief" this was to lessen the chances of the

employee would have to be reported as having missed work;

15. The non-medical Safety Employees would routinely review employee medical records with a physician's assistant whenever an occupational injury or illness looked like it would be reportable. "On information and belief" this was for the purpose of building a record but not reporting the incident;

16. It was common procedure for employees with occupational injuries or illnesses that should have missed work as a result thereof to be transported to and from work by other employees even when they were unable to work because of their injuries or illnesses. "On information and belief" this was to avoid reporting them as having missed work;

17. A physician's assistant routinely reviewed employee medical records with the non-medical Safety Employees in order to find a means to label an injury or illness as preexisting;

18. BWXT would routinely authorize unscheduled vacation/personal time or FMLA time for an employee who was injured or became ill on the job and needed to take time off the job as a result. "On information and belief" these days were not reported as missed work days; and

19. "On information and belief" the reports provided by the Safety Division to the senior management of BWXT were based on the systematic and underreporting of work-related injuries and illnesses time missed from work.

Plaintiff further contends on "information and belief" that during the contract period BWXT routinely and systematically certified as allowable costs, the wages and salaries of employees in the ES&H Division paid for time spent in falsifying records on work related injuries, illnesses and lost work days. Plaintiff also contends that, "on information and

7

belief" BWXT routinely and systematically certified as allowable costs the bonuses paid to employees in the ES&H Division and its senior management, for meeting the criteria for the fee paid for the category of Environment, Safety & Health, which bonuses were based on false records of work-related injuries, illnesses and lost work days.  [*Id.* at ¶ 51-52.]

With respect to harm of the government, the complaint alleges that "on information and belief" the reports that were provided by the ES&H Division to the senior management of BWXT were based on the systematic and significant underreporting for work-related injuries and illnesses and time missed from work further, on information and belief, the monthly reports, Completion Forms and the annual self-evaluations submitted by BWXT to DOE in connection with the computation of its Fee based on these false reports; that "on information and belief," DOE paid BWXT a Fee based, in part, on these false reports; and that on information and belief, the costs of wages and salaries and bonuses of employees certified as properly incurred by BWXT were based in part on these false reports. [*Id.* at ¶ 53-56.]

The complaint alleges that throughout her tenure as a nurse practitioner in OHS, plaintiff objected to her superiors about these practices and procedures and at one point she raised this issue in an open forum where employees could express their grievances.  As a result of these actions, plaintiff alleges she was placed on administrative leave on September 11, 2003, falsely charged with insubordination.  By letter dated October 13, 2003, she informed Dennis Ruddy, the President and General Manager of BWXT, that she had learned that her computer had been "cleaned out" because she had refused to participate in illegal

activities at OHS. She stated that the illegal activities included the underreporting of occupational injuries and illnesses resulting in large incentive payments to BWXT under the contract. In that letter she specifically asked that she be allowed to continue to work at BWXT. [*Id.* at ¶ 60-61.]

In response to her letter, an Employee Relations Representative asked for additional information concerning the circumstances of her being put on administrative leave and her allegations of underreporting. Plaintiff responded by memorandum dated October 30, 2003, reiterating that there was underreporting of work-related injuries and illnesses and detailing the events of September 11, 2003, when the alleged insubordination occurred. [*Id.* at ¶ 62-63.]

By letter dated January 16, 2004, Steve Smith of Human Resources terminated Marlar for insubordination. His letter stated that "[w]e have determined that your allegations of inappropriate activity within your department that would lead to a retaliatory discharge are unfounded." In fact Marlar was terminated because of her bringing the underreporting of work-related injuries and illnesses to the attention of her superiors including the senior management of BWXT. [*Id.* at ¶ 64.]

Defendant contends that Plaintiff's complaint does not satisfy the 9(b) Federal Rules of Civil Procedure, in that it does not set out with sufficient particularity her allegations of fraud. Further, defendant contends that plaintiff's retaliation claim fails to state a claim upon which relief can be granted under the retaliation section of 31 U.S.C. § 3730(h).

9

II.     The Particularity Required by Rule 9(b).

The basis of a *qui tam* action is fraud in the filing of claims against the government. The United States Court of Appeals for the Sixth Circuit has held that in False Claims Act cases that the allegations in the complaint must comply with the particularity requirements of Federal Rules of Civil Procedure 9(b). *Sanderson v. HCA-The Healthcare Company*, 447 F3d 873, 877 (6th Cir. 2006). That court has further interpreted Rule 9(b) to require that the plaintiff "allege the time, place, and content of the alleged misrepresentations on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendant; and the injury resulting from the fraud." *Id.* "[A]t a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, where, when, and how' of the alleged fraud." *Id. United States ex. rel. Thompson v. Columbia/HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir. 1997). The Sixth Circuit also pointed out that the heightened pleading requirements of Rule 9(b) are met by a complaint that sets out:

> (1) precisely what statements were made and what documents, or oral representations, or what omissions were made, and
>
> (2) the time and place of each such statement and the person responsible for making (or in the case of omissions, not making) same, and
>
> (3) the content of such statements and the manner in which they mislead the [government], and
>
> (4) what the defendants obtained as a consequence of the fraud.

*Id.*, quoting *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.,* 290 F.3d 1301, 1310 (11th Cir. 2002).

In *Sanderson*, the court noted that the False Claims Act "attaches liability, not to the fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Id.*, citing *United States v. Rivera,* 55 F.3d 703, 709 (1st Cir. 1995). As the First Circuit Court of Appeals has noted "the *sine qua non* of a False Claims Act violation" is the fraudulent claim. *Clausen*, 290 F.3d at 1311.

The Court notes that large portions of the plaintiff's complaint, particularly with respect to the "false claims" allegedly presented to the government are made upon "information and belief." Although courts have permitted some allegations of fraud based on "information and belief," this exception cannot be mistaken "for license to base claims of fraud on speculation and conclusory allegations." *Sanderson*, 447 F.3d at 878. The Court further notes that the plaintiff did not identify any specific claims that were submitted to the United States, indicate the name or names of the employees who submitted those claims or identify the dates in which those claims were presented. Plaintiff also does not indicate in her complaint the date upon which she began working for the defendant although she was apparently terminated on January 16, 2004. Thus, identifying the dates upon which the alleged fraudulent claims may have begun is virtually impossible. Because of the general language of the complaint and the repeated allegations made on "information and belief," as well as the failure to identify any specific false claim presented to the Department of Energy or identify any individuals involved in the fraud, the Court finds that the plaintiff's claim fails to comply with the pleading requirements of Rule 9(b), Federal Rules of Civil Procedure.

III. Plaintiff's Retaliation Claim.

The FCA protects employees who pursue, investigate, or otherwise contribute to an action exposing fraud against the government. Section 3730(h) of the FCA states:

> A. Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms or conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). In order to establish a claim for retaliatory discharge, a plaintiff must show (1) she engaged in a protective activity; (2) her employer knew that she engaged in the protected activity; and (3) her employer discharged or otherwise discriminated against employee as a result of the protected activity. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). The United States Court of Appeals for the Sixth Circuit has noted:

> "When seeking legal redress for retaliatory discharge under the FCA, plaintiff has the burden of pleading facts which would demonstrate that defendant had been put on notice that plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government."

*Yuhasz*, quoting *United States ex. rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996).

In the instant case the complaint fails to properly allege the plaintiff's employer knew that she was engaged in any protected activity. There is no allegation from which it could

12

be inferred that plaintiff was considering bringing a *qui tam* action herself or assisting the government in bringing an FCA action. Absent that element, plaintiff's retaliation claim fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), Federal Rules of Civil Procedure.

IV. Conclusion

In light of the foregoing the defendant's Motion to Dismiss Plaintiff's Complaint [Doc. 27] is hereby **GRANTED** and this action is hereby **DISMISSED**.

Order accordingly.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE