UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* )<br>CLAUDIA MARLAR; and )<br>CLAUDIA MARLAR, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BWXT Y-12, L.L.C., )<br>)<br>Defendant. ) | No.: 3:04-CV-415<br>(VARLAN/SHIRLEY) |

## **MEMORANDUM AND ORDER**

Plaintiff Claudia Marlar ("Plaintiff Marlar") filed this civil action against Defendant BWXT Y-12, L.L.C., ("Defendant BWXT") seeking relief under the False Claims Act, 31 U.S.C. § 3730(h), for allegedly being discharged in retaliation for internal whistleblowing.[1] [*See* Doc. 1.] This case is before the Court on Defendant BWXT's Motion for Summary Judgment. [Doc. 59.] In the relevant filings, the parties dispute whether Plaintiff Marlar can establish certain elements of the prima facie case or show pretext for her claim of retaliation. [*See* Docs. 59, 64, 67, 69.] The Court has carefully considered Defendant BWXT's motion, the parties' briefs, and other supporting materials. [Docs. 59, 64, 67, 69.] For the reasons set forth herein, the Court will deny Defendant BWXT's motion for summary judgment.

---

[1]Because Plaintiff Marlar's other claims have been dismissed [*see* Docs. 45, 48], only the retaliation claim remains in this action.

## I. RELEVANT BACKGROUND

Defendant BWXT manages and operates the Y-12 National Security Complex ("Y-12"), located in Oak Ridge, Tennessee. [Doc. 64-5 at 1.] In April of 2002, Defendant BWXT hired Plaintiff Marlar to work in its Medical Department as a nurse practitioner. [Docs. 64-10 at 3; 64-13 at 18.] Stan L. Roberts ("Mr. Roberts"), assistant medical director for clinical operations, was Plaintiff Marlar's "administrative supervisor" at the time she worked at Y-12. [Doc. 64-7 at 1; 64-17 at 3.] Above Mr. Roberts, Dr. Dave Wehrly ("Dr. Wehrly"), site occupational medical director, also supervised Plaintiff Marlar. [Doc. 64-17 at 3.]

During an offsite meeting in March of 2003, Plaintiff Marlar allegedly asked Leslie Reed ("Mr. Reed"), the supervisor of the emergency services department at Y-12, a question during an open forum. [Docs. 64-5 at 1; Doc. 64-10 at 6.] She allegedly inquired whether the goal of the Safety Department was to improve safety or just to improve safety statistics. [Doc. 64-10 at 6.] According to Plaintiff Marlar, Mr. Reed became angry and stated that if anyone had an issue like this, they can leave. [Doc. 64-10 at 6.] The Safety Department is a separate division from the Medical Department, both of which reported to Mr. Reed during the relevant period. [Doc. 64-10 at 4.] It was the Safety Department's responsibility to handle documentation and records submitted to the Department of Energy ("DOE"). [Doc. 64-10 at 37.] Plaintiff Marlar alleges that Defendant BWXT received a performance incentive from the DOE for a good safety record. [Doc. 64-10 at 37.]

2

On July 23, 2003, the staff of the Medical Department, including Plaintiff Marlar, participated in an "Emergency Management Exercise." [Doc. 64-5 at 2.] This exercise or drill was intended to ensure that medical staff members were trained to provide the appropriate type and level of medical treatment for site personnel in an emergency situation. [Doc. 64-5 at 2; 64-10 at 3.] When there are mass casualties, the "medical staging depot" ("MSD") becomes activated; the MSD is a physical location at Y-12 designated as the place to treat injured personnel in a mass casualty emergency situation. [Doc. 64-10 at 9.] During the drill on July 23, 2003, Plaintiff Marlar went to the MSD and served as a "medical provider" in the triage area. [Doc. 64-10 at 3, 9.] According to Plaintiff Marlar, the triage team included two other individuals, Gloria Lane ("Ms. Lane") and Becky Sproles ("Ms. Sproles"). [Doc. 64-10 at 45.] According to Plaintiff Marlar, Nancy Underwood ("Ms. Underwood"), who was supposed to be acting as an observer or controller during the drill, yelled at her for leaving patients on a van stopped in front of the MSD. [Doc. 64-10 at 10.] Plaintiff Marlar alleges that the drill "became stressful" as a result of Ms. Underwood's conduct. [Doc. 64-10 at 9.]

Immediately after the drill was completed, the Medical Department engaged in a "hot wash" session, where participants discussed the drill and areas that needed improvement. [Doc. 64-10 at 12.] According to Plaintiff Marlar, Ms. Underwood stated that "the provider" at the triage area did not take care of patients in a timely manner. [Doc. 64-10 at 10, 12.] Ms. Underwood did not name Plaintiff Marlar when making the comment. [Doc. 64-10 at 31.] Ms. Underwood allegedly made a similar comment at a subsequent MSD training

3

session on August 28, 2003, a meeting that Plaintiff Marlar did not attend. [Doc. 64-10 at 31-32.] Plaintiff Marlar construed Ms. Underwood's comments as personal criticism of her and viewed the comments, along with Ms. Underwood's alleged conduct during the drill, as "harassment." [Doc. 64-10 at 12; 17; 45.]

Another MSD training session was scheduled for 12:30 p.m. on September 11, 2003. [Doc. 64-10 at 72.] On September 10, 2003, Plaintiff Marlar emailed the MSD Director, Dr. Ramesh Dowray ("Dr. Dowray"), and requested that she be released from participating in the MSD training sessions due to her issues with Ms. Underwood's criticism. [Doc. 64-10 at 75.] Dr. Dowray forwarded the request to Dr. Wehrly the same day. [Doc. 64-10 at 73.] On September 11, 2003, at 10:46 a.m., Dr. Wehrly denied Plaintiff Marlar's request and wrote:

> You are an essential member of the MSD team and participation on the MSD team is an essential element of your job here at Y-12. Therefore, I do not concur with your request to be exempted from MSD practice/training. Please see me if you have any questions regarding this response or the expectations for your participation in MSD activities.

[Doc. 64-10 a 73.] According to an electronic notice sent to Dr. Wehrly, Plaintiff Marlar, read the email at 12:32 p.m. [Doc. 64-17 at 15.] While reading Dr. Wehrly's email, Mr. Roberts came to her door and told her to go to the MSD meeting. [Doc. 64-10 at 23.] Plaintiff Marlar responded that she was going to speak to Dr. Wehrly first. [Doc. 64-10 at 23.] Plaintiff Marlar then went to Dr. Wehrly's office to talk about the denial of her request. [Doc. 64-10 at 23.] After speaking with Dr. Wehrly, Plaintiff Marlar admits she had no doubt that Dr. Wehrly expected her to attend the MSD meeting. [Doc. 64-10 at 24.] Instead

4

of going to the meeting, Plaintiff Marlar then telephoned Mr. Reed, who also told her to go to the meeting. [Doc. 64-10 at 25.] As Plaintiff Marlar was allegedly going to the meeting after speaking with Mr. Reed, she encountered Mr. Roberts and Dr. Wehrly who told her to instead attend a meeting with labor relations. [Doc. 64-10 at 27.] At the meeting with labor relations, Plaintiff Marlar was sent home on administrative leave with pay pending an investigation of her alleged insubordination.[2] [Doc. 64-10 at 49.]

While on leave, Plaintiff Marlar sent a letter to Dennis Ruddy ("Mr. Ruddy"), President and General Manager of Defendant BWYT, asking that he "act to prevent my termination from employment as a Nurse Practitioner at Y-12 Occupational Health Services." [Doc. 64-10 at 52.] In the letter dated October 13, 2003, Plaintiff Marlar stated that she had reported two illegal activities to Dr. Wehrly: (1) that patient medical records were not being kept confidential; and (2) that occupational recordable injuries were being under-reported in order for Defendant BWXT to received bigger award fees. [Doc. 64-10 at 52.]

On October 27, 2003, Plaintiff met with Steve Weaver ("Mr. Weaver") regarding her allegations. [Doc. 64-10 at 40.] She then submitted a memorandum dated October 30, 2003, to Mr. Weaver, who requested further information on behalf of Defendant BWXT. [Doc. 64-10 at 54.] The memorandum further elaborated on the allegations raised in Plaintiff Marlar's October 13, 2003, letter to Mr. Ruddy. [*See* Doc. 64-10 at 54-60.]

---

[2]Though sent home on administrative leave on September 11, 2003, Plaintiff Marlar was previously scheduled to begin FMLA leave for other reasons. [Doc. 64-10 at 49.] After Plaintiff Marlar's FMLA leave expired, she remained on administrative leave pending Defendant BWXT's investigation.

In November of 2003, James C. Nobles, Jr. ("Mr. Nobles") and Brenda Hunter ("Ms. Hunter") investigated Plaintiff Marlar's allegations regarding the insubordination incident and the allegations contained in her letter to Mr. Ruddy. [Doc. 64-4 at 1.] After Mr. Nobles and Ms. Hunter interviewed individuals related to Plaintiff Marlar's allegations, they concluded in a report dated January 14, 2004, that Plaintiff Marlar had engaged in insubordination and that there was no support for the allegations in her letter to Mr. Ruddy. [Doc. 64-11.] In a letter dated January 16, 2004, Defendant BWXT informed Plaintiff Marlar via certified mail that she was "indeed guilty of insubordination on September 11, 2003" and that her "allegations of inappropriate activity within your department that would lead to a retaliatory discharge are unfounded." [Doc. 64-10 at 96.] The letter also notified Plaintiff Marlar that her "employment with BWXT Y-12 is being terminated effective January 16, 2004 for insubordination." [Doc. 64-10 at 96.]

On September 8, 2004, Plaintiff Marlar filed this action alleging that her termination constituted retaliation in violation of the False Claims Act, 31 U.S.C. § 3730(h).

## II. ANALYSIS

### A. Standard of Review

Under Fed. R. Civ. P. 56(c), summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The court must view the facts

6

and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the fact finder. *Id.* at 249. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. *Id.* Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

### B.   False Claims Act - Retaliation

In this case, Plaintiff Marlar seeks relief for alleged retaliation by Defendant BWXT in violation of the False Claims Act ("FCA"), 31 U.S.C. 3730(h)(1), which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, or agent on behalf of the employee, contractor, or agent or associated others in furtherance of other efforts to stop 1 or more violations of this subchapter.

7

31 U.S.C. 3730(h)(1).

To establish a retaliation claim, a plaintiff must show: (1) that she was engaged in a protected activity; (2) that the employer knew that she engaged in the protected activity; and (3) that the employer discharged or otherwise discriminated against the employee as a result of the protected activity. *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003). In some cases, the Sixth Circuit has further divided the final prima facie element into (3) whether the employer took an employment action adverse to the plaintiff and (4) whether there was a causal connection between the protected activity and the adverse action. *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007). Once a plaintiff has made this showing, a defendant-employer may rebut the presumption by asserting a legitimate, non-retaliatory reason for the discharge. *Id.* The burden then shifts back to the plaintiff who must show that the defendant-employer's proffered lawful reason was pretext for retaliation. *Id.*

In this case, Defendant BWXT has challenged Plaintiff Marlar's ability to establish (1) the prima facie element of a causal connection between her termination and her allegations; (2) pretext; and (3) her engagement in protected activity. The Court will address each argument in turn.

### 1. Causal Connection

Defendant BWXT first argues that Plaintiff Marlar cannot establish a causal relationship between her termination and her written communications to Defendant BWXT in October of 2003. Plaintiff Marlar contends that temporal proximity alone sufficiently

8

Case 3:04-cv-00415   Document 70   Filed 07/23/09   Page 8 of 16   PageID #: 986

establishes the causal connection element. Even if temporal proximity alone is insufficient, Plaintiff Marlar argues that the causal connection element is supported by other evidence showing that her alleged acts of insubordination were insufficient to result in termination.

In the Sixth Circuit, the law on whether temporal proximity alone is sufficient to show causation is "far from uniform." *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 629 (6th Cir. 2008). For example, in *Mickey v. Zeidler Tool and Die Co.*, the Sixth Circuit held that "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." 516 F.3d 516, 525 (6th Cir. 2008). However, others cases have suggested that temporal proximity alone may never be enough to show causation. *See Hamilton*, 522 F.3d at 629 ("Sixth Circuit law on this particular point is far from uniform, however, with other cases suggesting proximity alone may never be enough to show causation."). In cases involving longer periods of time, additional evidence of causation is needed to withstand summary judgment. *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) ("We agree with the magistrate judge that '[b]ecause the disciplinary actions occurred two to five months after Hafford filed charges, and are fairly evenly spread over a period of time, the inference of a causal connection based on temporal proximity alone is tenuous.' Absent additional evidence, this loose temporal proximity is insufficient to create a triable issue."). In *Hamilton v. General Elec. Co.*, the Sixth Circuit recognized such "additional evidence" when a plaintiff alleged that his bosses heightened their scrutiny of him after he

9

filed an EEOC complaint. 556 F.3d 428, 435 (6th Cir. 2009). The Sixth Circuit held that "[t]he combination of this increased scrutiny with the temporal proximity of his termination occurring less than three months after his EEOC filing is sufficient to establish the causal nexus needed to establish a prima facie case." *Id.* at 435-36.

When viewed in a light most favorable to Plaintiff Marlar, there is evidence of a heightened investigation of her only after she sent the letter to Mr. Ruddy containing her allegations of illegal activities at Y-12 by medical personnel. While there is evidence that Defendant BWXT informed Plaintiff Marlar on September 11, 2003, that it was going to investigate the insubordination incidents, there is also evidence that Defendant BWXT engaged in a more intense investigation only after she sent the letter alleging illegal activities akin to the heightened scrutiny in *Hamilton*, 556 F.3d at 435. For example, Plaintiff Marlar did not meet with Mr. Weaver to discuss her allegations until October 27, 2003. [Doc. 64-10 at 40.] Mr. Nobles and Ms. Hunter did not interview pertinent individuals until November 5, 2003, nearly two months after the alleged insubordination incidents. [Doc. 64-4 at 1.] While Defendant BWXT may be able to assert a non-retaliatory reason for waiting until late October and early November of 2003 to begin meeting with and intensely investigating Plaintiff Marlar, such as the fact that Plaintiff Marlar was previously on FMLA leave, this is an issue for resolution by the finder of fact. For instance, even though Plaintiff Marlar was on FMLA leave, the other employees would have been available to Mr. Nobles and Ms. Hunter prior to Plaintiff Marlar's letter to Mr. Ruddy. Because Plaintiff Marlar benefits from all favorable facts and inferences at this stage, the evidence of a heightened investigation of

her combined with the span of approximately three months between Plaintiff Marlar's letter to Mr. Ruddy on October 13, 2003, and her termination on January 16, 2003, is sufficient to avoid summary judgment based on the causal connection prima facie element.

### 2. Pretext

Under the burden-shifting framework, a defendant must come forward with a legitimate, non-retaliatory reason for its action. *Hamilton*, 556 F.3d at 436. In the present case, Defendant BWXT's proffered reason is that Plaintiff Marlar was insubordinate to Mr. Roberts and Dr. Wehrly when she did not attend the MSD training session on September 11, 2003.

Thus, the burden returns to Plaintiff Marlar, who must prove that Defendant BWXT's proffered non-retaliatory reason is actually pretextual. *Hamilton*, 556 F.3d at 436. Plaintiff Marlar may establish pretext by showing: (1) that the proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the employer's action; or (3) the proffered reasons were insufficient to motivate the employer's action. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The first showing "consists of evidence that the proffered bases for the plaintiff's [adverse employment action] never happened." *Id*. Under the second showing, a plaintiff "attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id*. (emphasis in original). The third showing ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not subject to an adverse employment action even

11

though they engaged in substantially identical conduct to that which the employer contends motivated a defendant's actions toward a plaintiff. *Id.* In this case, Plaintiff Marlar concedes that she refused to attend the September 11, 2003, for a period of time so that Defendant BWXT's proffered reason has basis in fact. Instead, she contends that there is sufficient evidence that an illegal motivation was more likely than not behind her termination.

After careful consideration of the record, the Court finds that Plaintiff Marlar has made a sufficient showing of pretext to preclude summary judgment on that basis. As previously discussed as part of the causal connection analysis, there is evidence that Plaintiff Marlar was more intensely investigated by Defendant BWXT only after she made allegations of illegal activities. In *Blair v. Henry Filters, Inc.*, the Sixth Circuit concluded that evidence produced in support of a plaintiff's prima facie case "may, but will not necessarily, suffice to show a genuine issue of material fact concerning pretext." 505 F.3d 517, 533 (6th Cir. 2007). In this case, there is other evidence beyond that of the prima facie case to support a finding of pretext. For instance, there is a notation from an interview with Mr. Reed on November 14, 2003, that he "would not agree to terminate [Plaintiff Marlar] based on what he knew on 9/11/03, i.e., what appeared to be one event/issue." [Doc. 64-12 at 10.] When construed in a light most favorable to Plaintiff Marlar, such evidence suggests that her alleged incidents of insubordination would not be sufficient to support termination for "what appeared to be one event/issue." [Doc. 64-12 at 10.] While Defendant BWXT contends that Mr. Reed's deposition testimony and other notations from the interview show that he merely

12

wanted to have a thorough investigation prior to terminating Plaintiff Marlar, a reasonable finder of fact could conclude differently given the notation about "one event/issue."

Furthermore, Mr. Reed's decision to not immediately terminate Plaintiff Marlar for "what appeared to be one event/issue" on September 11, 2003, was made prior to Plaintiff Marlar's letter to Mr. Ruddy on October 13, 2003. When considered together with Plaintiff Marlar's testimony that Mr. Reed became upset and stated that "[i]f anyone has an issue like this, they can leave" when she asked during an open forum in March of 2003 whether the goal was to improve safety or just to improve safety statistics [Doc. 64-10 at 6], a finder of fact could conclude that Plaintiff Marlar's allegations regarding safety statistics to Mr. Ruddy led to her termination. While Defendant BWXT argues that the accounts of others contradict Plaintiff Marlar's testimony about Mr. Reed, the Court notes that it does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter on summary judgment. *Anderson*, 477 U.S. at 249. To the extent there is conflicting evidence on this issue, it is for the finder of fact to resolve.

Because Plaintiff Marlar has presented sufficient evidence of pretext and genuine material issues of fact remain, the Court declines to grant Defendant BWXT's motion for summary judgment on this basis.

### 3. Protected Activity

Defendant BWXT finally contends that Plaintiff Marlar did not engage in a protected activity because she "simply imagined fraud in the absence of proof." [Doc. 64 at 42.] In particular, Defendant BWXT focuses on the fact that the specific instances identified by

13

Plaintiff Marlar of incomplete medical records nonetheless resulted in recordable injuries for purposes of Safety Department reporting.

A "protected activity" means "an activity which reasonably could lead to a viable FCA action." *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000). The FCA protects "employees while they are collecting information about a possible fraud, *before* they have put all the pieces of the puzzle together." *Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) (emphasis in original). In *Yesudian*, the fact that a plaintiff failed to find evidence to prove a qui tam claim under the FCA was not fatal because "there is no requirement that to be protected, a plaintiff must have gathered all the evidence by the time of the retaliation." *Id.* "Qui tam" refers to an action that a private individual may bring for alleged FCA violations on behalf of the government. *Poteet v. Medtronic, Inc.*, 552 F.3d 503, 506-07 (6th Cir. 2009). In other words, the FCA's retaliation provision "covers investigations that, although reasonable in prospect, do not pan out and thus do not lead to actions under the False Claims Act." *Lang v. Northwestern Univ.*, 472 F.3d 493, 494 (7th Cir. 2006).

Though Defendant BWXT focuses on the fact that the specific instances identified by Plaintiff Marlar did not result in fraud, "[t]he fact that [a plaintiff] may have failed to find such evidence in the end means only that - if such evidence were necessary to prove a False Claims Act case - he ultimately would not be entitled to recover on his qui tam claim." *Yesudian*, 153 F.3d at 740. Thus, even though the instances identified by Plaintiff Marlar may not sufficiently support a qui tam claim, this fact does not necessarily preclude a finding

14

that she engaged in a protected activity. Instead, the Court's inquiry is whether there is sufficient evidence of "an activity which reasonably could lead to a viable FCA action." *McKenzie*, 219 F.3d at 516.

In her October 30, 2003, memorandum to Mr. Weaver, Plaintiff Marlar alleged that "[c]ontrolled substances are dispensed when no prescription has been written and controlled substances are dispensed to patients, but no record is kept in the patient's chart." [Doc. 64-10 at 54.] In her deposition, Plaintiff Marlar testified about witnessing how one patient's medical record did not include all of the medications given to the patient. [Doc. 67-1 at 3.] According to Plaintiff Marlar, this incident indicated that "that kind of thing was going on quite a bit. Omitting the complete record." [Doc. 67-1 at 3.] A letter from Dr. Wehrly identified problems with medical staff not writing prescriptions or making clinical notations of prescriptions in the medical record. [Doc. 67-1 at 38.] Such evidence could support Plaintiff Marlar's belief that medical staff were not properly recording prescriptions. There is also evidence that the Safety Department sent the Medical Department an email discussing when to administer non-prescription medication, which could be viewed as the Safety Department's involvement in the treatment of patients and preference for administering non-prescription strength medications, which are not recorded. [Doc. 67-1 at 42.] Defendant BWXT has also admitted that "safety statistics are included in the award/comprehensive fee documentation." [Doc. 64 at 28.]

When viewed in a light most favorable to Plaintiff Marlar, this evidence could arguably support the protected activity element. As previously discussed, the fact that such

15

evidence may not be sufficient to support a qui tam claim does not preclude Plaintiff Marlar from engaging in a protected activity for purposes of her retaliation claim. Thus, the Court leaves it for the finder of fact to weigh the evidence and ultimately determine whether Plaintiff Marlar engaged in a protected activity. Accordingly, Defendant BWXT's motion for summary judgment will be denied to the extent it contends that Plaintiff Marlar did not engage in a protected activity.

## III. CONCLUSION

For the reasons set forth herein, Defendant BWXT Y-12, L.L.C.'s Motion for Summary Judgment [Doc. 59] is hereby **DENIED**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE